**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

STEFAN ANDRE WILSON, a/k/a
Steven K. Wilson, a/k/a Stefan A.
Wilson, a/k/a Stephen K. Wilson,
              *Defendant,*

v.

RICHARD A. GRAY, JR., GRAY
INVESTMENT PARTNERS, and
CUMBERLAND HILL CAPITAL FUND,
L.P.,
              *Movants-Appellants.*

No. 09-10330

D.C. No.
2:08-CR-00114-
LKK

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, District Judge, Presiding

Argued and Submitted
September 15, 2010—San Francisco, California

Filed October 28, 2011

Before: J. Clifford Wallace and Sidney R. Thomas,
Circuit Judges, and Richard Mills,* Senior District Judge.

Opinion by Judge Mills

*The Honorable Richard Mills, Senior United States District Judge for
the Central District of Illinois, sitting by designation.

19597

**COUNSEL**

David W. Klaudt (argued), Cynthia K. Timms, and Jason M. Hopkins, Locke Lord Bissell & Liddell LLP, Dallas, Texas, for the movants-appellants.

Kristen S. Door, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

## OPINION

MILLS, Senior District Judge:

Petitioner-Appellants Richard A. Gray, Jr., Gray Investment Partners, and Cumberland Hill Capital Fund, L.P.,[1] (collectively "Gray") appeal the district court's order dismissing their third-party petition to adjudicate property interests in forfeited property. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.

### I.

### A.

Stefan Wilson operated a fraudulent investment fund. His Ponzi scheme took almost $13 million from over 50 investors. Gray was among the investors.

By January 2008, the Government had been investigating Wilson for some time. Unaware of the investigation, Gray executed a standard subscription agreement in Wilson's fund on January 28, 2008. Gray wired a total of $2.3 million to Wilson's account at Washington Mutual Bank on February 2, 2008.

On February 2 and February 5, 2008, Wilson transferred the entirety of Gray's funds to an Ameritrade brokerage account, which Wilson had been using to carry out his fraud. Prior to the transfer of Gray's funds, the account balance was allegedly $324.43.

On February 12, 2008, an FBI agent met with Nell Johnson, another victim of the Ponzi scheme. Following the inter-

---

[1] Mr. Gray either controls or owns Gray Investment Partners and Cumberland Hill Capital Fund. At Gray's direction the two entities deposited funds with Wilson.

view, Johnson demanded that Wilson return her investment. Wilson transferred $425,000 from the Ameritrade account to an account held by Johnson.

On February 15, 2008, Wilson was arrested, and the balance of the Ameritrade account—$1,490,418.57—was seized. The Government also seized the $425,000 that Wilson had transferred to Johnson. Wilson was indicted on March 13, 2008, and entered into a plea agreement with the Government.

Gray argues that he can trace all of the $425,000 that ended up in Johnson's account to his investment. Gray further argues that all but $324.43 of the funds seized from the Ameritrade account are traceable to Gray's investment.

The remainder of Gray's investment—$384,905.86—was diffused via lulling payments, trading losses, and margin calls during the two weeks that Wilson held the investment.

**B.**

Pursuant to the plea agreement, the district court entered its preliminary order of forfeiture on April 21, 2009, forfeiting to the Government the $1,490,418.57 balance in the Ameritrade account and the $425,000 in Johnson's account. Gray filed his petition on June 2, 2009.

Gray's petition, filed under 21 U.S.C. § 853(n)(2), alleged that Gray had an interest in $1,915,094.14 of the forfeited funds, and that his interest was superior to that of Wilson and that of the Government.

The Government filed a motion to dismiss the petition, and, after the issue was fully briefed and a hearing was held, the district court granted the motion to dismiss.

In its published order, the district court began by reviewing the applicable standards in forfeiture proceedings. The district

court stated that "[p]ersons who have been convicted of specified crimes must forfeit to the government property derived from or obtained as a result of the crime or used to commit or facilitate the crime." *United States v. Wilson*, 640 F. Supp. 2d 1257, 1259 (E.D. Cal. 2009). The district court noted that under § 853(c), the "government's interest in the property vests at the moment the crime occurs." *Id.* The district court explained that "certain narrow classes of owners of the property have interests in the property superior to the government. Such asserted interests are adjudicated at a hearing, which the statute describes, as well as when a third-party's interest is superior to that of the government." *Id.* (citation omitted).

The district court started its analysis by examining whether a constructive trust arose upon Gray's transfer of funds to Wilson. The district court and the parties assumed that California law applied to this question.

The district court explained that in *United States v. $4,224,958.57* (*"Boylan"*), 392 F.3d 1002, 1004 (9th Cir. 2004), we "held unequivocally that [under California law] a constructive trust arises by operation of law as soon as the fraudster obtains the victim's property." *Wilson*, 640 F. Supp. 2d at 1259-60.

The district court noted, though, that in *Davies v. Krasna*, 14 Cal. 3d 502, 515-16 (1975), the California Supreme Court adopted the view that constructive trusts had to be created by a court. *Wilson*, 640 F. Supp. 2d at 1260.

The district court aired its misgivings about *Boylan*'s fidelity to California law, but recognized that it had to follow the precedent of this Court. The district court found that Gray, pursuant to *Boylan*, "obtained a constructive trust in the property that was the subject of the defendant's fraud by operation of law at the moment the fraud occurred." *Id.*

After reviewing Gray's claim against the property under § 835(n), the district court found that "[w]hile it seems clear

that under *Boylan* the [Gray] petitioners do have an interest superior to the defendant it also appears that interest is not superior to the government." *Id.* at 1261.

Next, the district court examined the case of *United States v. Hooper*, 229 F.3d 818 (9th Cir. 2000), where the wives of two drug dealers tried to lay claim against forfeited drug proceeds under the theory that, pursuant to California law, they had an automatic community property interest in these proceeds. The district court noted that, in *Hooper*, we "held that the government has interest in the property, except where a third party was a bona fide purchaser of the property or the third-party's interest antedated the crime." *Wilson*, 640 F. Supp. 2d at 1261.

The district court stated that although Gray had an interest in the funds prior to the crime, that interest ceased when the funds were transferred to Wilson. *Id.* at 1262. The district court noted that a new interest was formed at the time of the transfer, but that Gray's new interest arose simultaneously to the creation of Government's interest. *Id.* The district court held that Gray's interest was inferior to the Government's interest.

Finally, the district court concluded that the petitioners lack prudential standing. The district court noted that the Government's briefing on that point was a recitation of the magistrate judge's findings and recommendations in a related case, *United States v. Real Property Located at 730 Glen-Mady Way*, 590 F. Supp. 2d 1295, 1297 (2008) (civil *in rem* forfeiture proceeding against defendant Wilson's house). *Wilson*, 640 F. Supp. 2d at 1262.

The district court briefly summarized a few key points that the magistrate judge made in *730 Glen-Mady Way*: Congress has created a statutory structure for victims to receive restitution and that "the interests of crime victims in receiving restitution are not in the zone of interests implicated in the statute

governing the forfeiture hearing." *Wilson*, 640 F. Supp. 2d at 1262.

The district court concluded by stating the following: "For the same reasons that the court adopted [the magistrate judge's] findings in [*United States v. Real Property Located at 730 Glen-Mady Way*], the petitioners appear to lack prudential standing in this action." *Id.*

## II.

"In a case involving § 853(n), we review the district court's findings of fact for clear error and its legal conclusions *de novo*." *United States v. Nava*, 404 F.3d 1119, 1127 n.3 (9th Cir. 2005). The facts alleged in Gray's petition are assumed to be true. *See* Fed. R. Crim. P. 32.2(c)(1)(A) ("In the ancillary proceeding, the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason. For purposes of the motion, the facts set forth in the petition are assumed to be true.").

## III.

### A.

The district court erred in holding that Gray lacks prudential standing. The Supreme Court has stated that "[b]eyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). "Congress legislates against the background of our prudential standing doctrine, which applies unless it is expressly negated." *Bennett v. Spear*, 520 U.S. 154, 163 (1997).

In this case, the district court raised the issue of prudential standing under the zone of interests test. In order for a litigant

to have prudential standing under the zone of interests test, the litigant's claim must fall within the zone of interests protected by the law invoked. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004).

**[1]** However, there are situations where the zone of interests test does not apply to a statute, because Congress has negated that test. *See Bennett*, 520 U.S. at 164-65. When Congress broadly opens the remedy to "any person," without qualification, the zone of interests test does not apply. *Id.*

**[2]** Here, the forfeiture statute provides:

> *Any person*, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

21 U.S.C. § 853(n)(2) (emphasis added). Therefore, with the exception of the defendant, any person may petition the court for the property.

**[3]** Accordingly, we conclude that, pursuant to *Bennett*, the zone of interests test does not apply to this case. Consequently, we hold that Gray has prudential standing to assert a claim.

### B.

The district court erred when it found that the Government's interest in the funds was superior to Gray's interests. The key statutory provision states:

If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

21 U.S.C. § 853(n)(6).

**[4]** The language of § 853(n)(6)(A) is clear. If the petitioner can show by the preponderance of the evidence that his interest is greater than that of the defendant, the district court is to amend the order of forfeiture.

The district court looked to the combination of § 853(n)(6)(A) and the portion of the forfeiture statute related to third party transfers—§ 853(c)—to come to its conclusion. Section 853(c) provides:

> All right, title, and interest in property described in subsection (a) of this section vests in the United

States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C. § 853(c).

The district court relied upon the interplay between 853(c) and 853(n)(6)(A) to dismiss Gray's petition. The district court reasoned that the Government took title to Gray's money upon Wilson's receipt of the funds, and therefore the Government's interest must be weighed against Gray's constructive trust, which arose at the same time under *Boylan*.

The district court created a false conflict. Section 853(c) concerns only third-party transfers, like the situation in *Hooper*. *See Hooper*, 229 F.3d at 821. The language in § 853(c) is broad, because it is laying claim to interests downstream from the defendant.

In *Hooper*, the defendants' wives claimed that they had community property interests in the proceeds from drug sales that were forfeited when the defendants were convicted. 229 F.3d at 819-20. The wives claimed that, pursuant to state law, the property interest arose automatically. *See id.*

In *Hooper*, we examined 21 U.S.C. § 853(n)(6)(A) and interpreted the temporal requirement of that subsection as applying to both vested interests and superior interests. 229 F.3d at 821. This means that for a petition to succeed: (1) the interest must have vested to the petitioner, rather than the

defendant, at the time the offense occurred, or (2) the petitioner had a superior interest than the defendant at the time the offense occurred. *See id.*

*Hooper* is not entirely analogous to the case before us. First, as we pointed out in *Hooper*, § 853(n)(6)(A) is better designed to deal with the instrumentalities of crime than the proceeds of crime. 229 F.3d at 822. In *Hooper*, we drew a sharp dichotomy between the instrumentalities and the proceeds of crime. *Id.* (employing the analogy of a husband using the family's car to conduct drug deals (the instrumentality) and the money received in the course of those deals (the proceeds)). Of course, the problem with Ponzi schemes is that a fraud victim's money is both an instrumentality and the proceeds of the crime.

Second, *Hooper* relates to closing a loophole that would otherwise allow the spouses of drug dealers to legally obtain the proceeds of the crime. In the instant case, we are dealing with a petitioner who had an interest both *before* and *after* the crime.

The district court's heavy reliance on *Hooper* is misplaced. The point of *Hooper* and § 853(c) is that the Government's interest attaches at the time of the crime, in order to prevent criminals from distributing the proceeds of crime to friends, relatives, and straw persons.

**[5]** Immediately before the transfer of funds, Gray owned his own money. At the time of transfer, a constructive trust arose, pursuant to *Boylan*. Also at the same time, the Government's interest attached. So, the district court was correct that these two interests arose simultaneously.

**[6]** The district court erred in concluding that these interests are in conflict. It is pursuant to the Government's interest that the property is seized and later subjected to proceedings under § 853(n). Therefore, the attachment of the Govern-

ment's interest under § 853(c) is a threshold event that gives rise to the petitioner seeking the return of the fraudulently obtained property.

**[7]** Contrary to the conclusions of the district court, once the original owner meets the burden of proof set out at § 853(n), the Government's interest is eliminated.

The district court held:

> Here, under *Hooper*, it appears that petitioners' interests are not cognizable under § 853(n)(6)(A). Although they had an interest in the claimed property prior to the crime, since they were the original holders of the property that defendant obtained through fraud, this interest ceased when the petitioners transferred the property to the defendant. A new interest arose when they became victims of the fraud; this is the constructive trust interest that petitioners assert. This interest, however, arose by virtue of the defendant's fraud and, as such, arose simultaneously with the government's interest. *See* 21 U.S.C. § 853(c). Therefore it appears that under *Hooper* and the plain language of § 853, petitioners' interests did not precede the government's and thus do not fit into either of the categories recognized as defeating the government's claimed forfeiture.

*Wilson*, 640 F. Supp. 2d at 1262. Under this view, in order for a petitioner to prevail, they would need to not only have a preexisting interest in the property, but, in addition, their type of interest in that property could not have changed due to the commission of the crime. The district court essentially held that because there was a change in the kind of interest Gray held, he lost his right to his funds.

**[8]** Under *Hooper*, a petitioner's interest must have existed prior to the event that gave rise to the Government's interest.

229 F.3d at 821. As detailed above, in *Hooper* our analysis did not consider the kind of case that is now before us. Therefore, we now hold that a petitioner's interest, *or a related interest derived from the petitioner's original interest*, must have existed prior to the event that gave rise to the Government's interest.

**[9]** Under § 853(n), Gray's interest is greater than Wilson's. The Government is merely standing in Wilson's shoes, and its interest cannot exceed Wilson's interest. Therefore, the district court erred in holding that the Government's interest was greater than Gray's.

## C.

The Government proposes that the whole issue can be resolved if we overturn *Boylan*. The Government maintains that without *Boylan*, no constructive trust would have automatically been in place on behalf of Gray, and as a result, he would be unable to proceed under § 853.

The Government argues that in *Boylan*, we did not accurately interpret California law. Under *Boylan*, constructive trusts arise as a matter of law at the time the fraud is perpetrated.

Critics argue that *Boylan* runs counter to a number of California appellate cases, *see, e.g.*, *Embarcadero Mun. Imp. Dist. v. Cnty. of Santa Barbara*, 88 Cal. App. 4th 781 (2001), and one California Supreme Court case, *Davies v. Krasna*, 14 Cal. 3d 502 (1975), which hold that constructive trusts only arise at the time they are put into effect by a court, after determining that the elements of California Civil Code §§ 2223 and 2224 have been met.

Nevertheless, in *Boylan*, we scoffed at the notion that a constructive trust could not come into existence until a court so decided. *Boylan*, 392 F.3d at 1004. As the Government

notes, the Court in *Boylan* relied upon the California Civil Code, the Restatement (First) of Restitution (1937), the Restatement of the Law of Restitution, California Annotations (1940), and *Scott on Trusts* (4th ed. 1989), rather than looking to California case law. *Boylan*, 392 F.3d at 1004.

Generally, a three-judge panel of this Court may not overturn circuit precedent. *See Palmer v. Sanderson*, 9 F.3d 1433, 1437 n.5 (9th Cir. 1993). Even if we agreed that *Boylan* should be overturned, we are without the power to do so.[2]

### D.

We note that our decision results in a different outcome than the U.S. Court of Appeals for the Eleventh Circuit reached in *United States v. Ramunno*, 599 F.3d 1269 (11th Cir. 2010), but that case is distinguishable on an important point.

In *Ramunno*, the Eleventh Circuit faced an almost identical

---

[2]Similarly, we decline to effectively revise *Boylan*'s holding with a novel interpretation. The language and reasoning of *Boylan* are clear: "[t]he obligation on the fraudster is imposed by law and arises immediately with his acquisition of the proceeds of the fraud." *Boylan*, 392 F.3d at 1004. As to the question of whether a court must weigh the equities before establishing a constructive trust, the *Boylan* court noted that "[i]t is an elementary mistake to suppose that a court creates a trust." *Boylan*, 392 F.3d at 1004; *see also id.* (characterizing the expression "the court constructs the trust," as "absurd" (quotations omitted)).

In *Boylan* we were not merely presuming that the equities warranted a trust for the purposes of a standing analysis. The *Boylan* court based its decision that Appellants had standing on the existence of a constructive trust. As the opinion detailed, "[i]f the Appellants can prove their [fraud] claims . . . they are the beneficiaries of the constructive trust and have, *therefore*, equitable interests in it. . . . They *consequently* have Article III standing in the [forfeiture] proceeding." *Id.* at 1005 (emphases added). The court did not hold that a trust "might" or "may" be imposed. It held that a constructive trust was imposed, and it directed the district court to administer "that trust." *Id.* at 1005.

scenario as we face in the instant case. An investor in a Ponzi scheme transmitted $2 million shortly before the Government seized the fraudster's assets, and the investor alleged he could trace his investment funds. *Id.* at 1271-72. The investor filed a petition and requested that the court amend the preliminary order of forfeiture. *Id.* at 1272. The district court granted the Government's motion to dismiss the petition without holding an evidentiary hearing. *Id.*

The district court refused to award the investor a constructive trust, reasoning that to allow the investor full recovery would inequitably diminish the pool available to the remaining victims. *Id.* at 1275. The Eleventh Circuit affirmed the decision of the district court, holding that the district court did not abuse its discretion in denying the investor a constructive trust. *Id.* at 1276.

The outcomes in *Ramunno* and this case are different because they both involve the interpretation of state law by the federal courts of appeals. Under *Boylan*, this Court interprets California law as establishing a constructive trust at the time the fraud is perpetrated, without further court action. In *Ramunno*, the Eleventh Circuit interpreted Georgia law as requiring judicial action to establish a constructive trust, and further requiring that principles of equity and fairness be considered in determining whether to establish a constructive trust.[3] *Id.* at 1274.

---

[3] We do not hold that concerns for "equity and fairness" cannot be considered when addressing a constructive trust arising in California. Rather, we simply observe that *Boylan* requires that a constructive trust is automatically imposed when a claimant establishes fraud. We note, however, that courts still consider "equity and fairness" under *Boylan*—they consider them in the administration, and not the creation, of constructive trusts. *See Boylan*, 392 F.3d at 1005 (remanding to the district court to administer the trust, "taking steps to assure that no claimant obtains more than his or her fair share.").

## E.

There are several issues that will need to be resolved on remand. The district court did not hold an evidentiary hearing under § 835(n), because the petition was dismissed. As a result of the dismissal, we have presumed that Gray's allegations, such as the traceability of the funds, are true. *See* Fed. R. Crim. P. 32.2(c)(1)(A). However, on remand Gray will have to meet the burden of proof set out in the statute.

Furthermore, this decision should not be read to preclude equitable analysis by the court below. The *Boylan* court remanded with instructions to administer the constructive trust fairly. *Boylan*, 392 F.3d at 1005. So do we. Thus, the court below should "tak[e] steps to assure that no claimant obtains more than his or her fair share." *Id*.

For example, even if the forfeited assets can be traced back to Gray's investment into Wilson's fraudulent scheme, this does not necessarily move him ahead of the other victims in this case.

**[10]** According to the Supreme Court, tracing rules can be suspended where equity so demands. *See Cunningham v. Brown*, 265 U.S. 1, 13 (1924). In *Cunningham*, creditors sought to rescind certain contracts with Charles Ponzi, the man who perpetuated the original eponymous scheme, based on allegations of fraud. Rather than allow these creditors to rely on tracing rules that would have permitted them to recover at the exclusion of similarly-situated creditors, the Court held that the money in the account belonged to *all* of the victims, not Ponzi, and that the use of the tracing presumption would harm some of the victims' rights. *Id.* Inasmuch as these creditors occupied the same legal position as other creditors, equity would not permit them a preference. *Id.* This was so, the Court explained, because "equality is equity." *Id.*

**[11]** The same principle seems applicable here. Because Gray relies on a tracing presumption as the basis for his alleged superior interest, this case arguably presents circumstances where equity would justify suspension of those tracing rules. *See id.* Indeed, under our precedent, courts generally will not indulge in tracing when doing so would allow one fraud victim to recover all of his losses at the expense of other victims. *United States v. 13328 & 13324 State Hwy. 75 N.*, 89 F.3d 551, 554 (9th Cir. 1996) (refusing to apply tracing rules in an SEC enforcement action).

Finally, we note that there are several disputed factual matters regarding the transfer of funds. These outstanding issues can be resolved on remand.

## IV.

The decision of the district court dismissing Gray's petition is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

**REVERSED AND REMANDED.**